# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

|  |  |
|---|---|
| FLATHEAD IRRIGATION DISTRICT; and FLATHEAD JOINT BOARD OF CONTROL<br><br>Plaintiffs,<br><br>vs.<br><br>SARAH "SALLY" JEWELL, Secretary of the Department of the Interior; STANLEY SPEAKS, Portland Area Director, Bureau of Indian Affairs; JOSEPH "BUD" MORAN, Superintendent, Flathead Agency, Bureau of Indian Affairs; U.S. DEPARTMENT OF THE INTERIOR; and U.S. BUREAU OF INDIAN AFFAIRS,<br><br>Defendants. | CV 14–88–M–DLC<br><br>ORDER |

Plaintiffs Flathead Irrigation District ("FID") and Flathead Joint Board of Control ("FJBC"), filed this action seeking declaratory and injunctive relief against the above-named Defendants, collectively "the United States," for claims arising out of the United States' recent and historical actions with respect to the Flathead Irrigation Project. The United States has moved to dismiss all of the claims. After briefing on the United States' motion to dismiss was completed,

1

Plaintiffs' moved the Court for leave to file their Second Amended Complaint.

For the reasons explained, the Court grants the motion to dismiss and denies the

motion for leave to file the Second Amended Complaint.

**BACKGROUND**[1]

## A.    Historical and Legal Background

This dispute has its origins in the formation of the Flathead Reservation in

1855, its allotment in 1904, and subsequent Congressional Acts over the next

100+ years, which together form the current legal landscape.  Therefore, some

historical context and discussion of the evolving legal landscape is required.

By the Treaty of Hellgate of 1855, the Bitteroot Salish, the Pend d'Oreille,

and the Kootenai tribes ("the Tribes") ceded to the United States all right, title,

and interest in a vast area of land formerly held by the Tribes under aboriginal

title.  12 Stat. 975 (1855).  In exchange, the United States agreed to pay to the

---

[1] Plaintiffs' Statement of Disputed Facts is not in compliance with Local Rule 56.1(b). Local Rule 56.1(b) requires a party opposing summary judgment to file a Statement of Disputed Facts which sets forth verbatim the moving party's Statement, and "adding *only* (A) whether each fact in the moving party's Statement is 'undisputed' or 'disputed'; and (B) if 'disputed,' pinpoint to a [record document before the Court] to oppose each fact." L.R. 56.1(b)(1) (emphasis added).  The rule does not allow for a response of "Undisputed and Qualified" or "Undisputed but Qualified," as submitted by Plaintiffs.  If a fact is undisputed, the response must simply state: "undisputed."  The rule does not allow for tangential flourishes to be tacked on to a response when a fact is undisputed.  That would defeat the purpose of the rule.  If additional facts are relied on to oppose a motion for summary judgment, those may be added separately, as provided in L.R. 56.1(b)(2).  Legal theories and arguments are not facts.
    Accordingly, IT IS ORDERED that all portions of Plaintiffs' Statement of Disputed Facts that do not comply with Local Rule 56.1(b) are STRICKEN.

Tribes the sum of $120,000, and from the vast area of land ceded to the United States, the Treaty of Hellgate reserved, "for the exclusive use and benefit" of the Tribes, the Flathead Reservation. The Flathead Reservation is comprised of approximately 1.317 millions acres and is located in northwest Montana. *Id.*

The nature of this large and undivided Indian reservation was dramatically altered in 1904 with the passage of the Act of April 23, 1904, 33 Stat. 302, known as the Flathead Allotment Act. Pursuant to the Flathead Allotment Act, the Flathead Reservation was surveyed and divided into parcels. Certain of these parcels were then "allotted" to individual Indians, but not all of them. The lands not allotted to individual Indians were deemed "surplus lands," and were opened for purchase and settlement by non-Indians.

Relevant to this case, the Flathead Allotment Act directed that the proceeds received from the sale of reservation "surplus lands" should be used to construct irrigation works for the exclusive benefit of the Tribes. However, pursuant to the Act of April 30, 1908, 35 Stat. 70, use of the irrigation works was authorized for irrigation of both Indian and non-Indian lands within the boundaries of the Flathead Reservation. Congress then prioritized the construction of irrigation works on the Flathead Reservation and required that payment for the construction and operating costs of the irrigation system be made through assessments to non-

Indian land purchasers. *Flathead Joint Bd. of Control of Flathead, Mission and Jocko Valley Irr. Dists. v. United States*, 30 Fed. Cl. 287 (1993); 35 Stat. 444, 448-50 (hereinafter "1908 Act"). Critical to this case, the 1908 Act contained a "turnover" or "transfer" provision, which reads as follows:

> When the payments required by this Act have been made for the major part of the unallotted lands irrigable under any system and subject to charges for construction thereof, the management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby, to be maintained at their expense under such form of organization and under such rules and regulations as may be acceptable to the Secretary of the Interior.

35. Stat. at 450.

These irrigation works, first authorized under the 1904 Act, are now known as the Flathead Irrigation Project ("the Project"). The Project currently supplies irrigation to approximately 127,000 acres of agricultural land in Flathead, Missoula, Lake, and Sanders counties of Montana, and the Flathead Reservation.

In 1926, Congress appropriated funds for continued construction of a power plant at the Project. The Act also appropriated funds for construction and maintenance of the irrigation division of the Project. 44 Stat. 453, 465. As a condition precedent for the appropriation of these funds, Congress required that irrigation districts be formed under state law and that those districts execute

repayment contracts with the United States for previously unpaid construction costs. *Flathead*, 30 Fed. Cl. at 290. To help defray costs, Congress directed that the net revenues from the power plant be paid to the United States to liquidate construction, operation, and maintenance costs for the Project. 35 Stat. 453, 465.

As of 1948, the amounts owed from irrigators for the Project remained unpaid. Congress therefore created a repayment schedule to pay back all then-existing construction debt over a 50 year period, and required the irrigation districts to execute amendatory repayment contracts.. *Flathead*, 30 Fed. Cl. at 290-91; 62 Stat. 269 ("1948 Act"). The 1948 Act provided that annual installments initially be paid from net power revenues from the power division, and then by an assessment against lands chargeable with the construction costs. *Id.* at 291.

The United States' policy with respect to Indian peoples changed in 1934. In 1934 the United States policy of allotment "was repudiated . . . with the passage of the Indian Reorganization Act." *Montana v. United States*, 450 U.S. 544, 559, n. 9 (1981)(citing 48 Stat. 984, at 25 U.S.C. § 461 *et seq*). Under the Indian Reorganization Act, the Secretary of the Interior was "authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened" to sale to non-Indians. 25 U.S.C. § 463(a). Pursuant to this authority, in

1936 the Secretary restored certain surplus lands on the Flathead Reservation to the Tribes.

The United States policy with respect to Indian peoples changed again with the passage of the Indian Self-Determination and Education Assistance Act ("Indian Self-Determination Act") in 1975. Through the Indian Self-Determination Act, Congress declared its commitment to "assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities." 25 U.S.C. § 450a. Congress sought to accomplish this goal:

> through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

25 U.S.C. § 450a. Consistent with this goal, Congress authorized the Secretary of the Interior and tribes to enter into contracts, commonly referred to as self-determination or P.L. 638 contracts, "in which tribes promise to supply federally funded services, for example tribal health services, that a Government agency would otherwise provide." *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 634 (2005) (citing 25 U.S.C. § 450f).

In 1986, the Tribes entered into such a P.L. 638 contract with the Secretary in order to assume operation and management of the Power Division of the Project. In response, in 1992, the FJBC sued the United States in the United States Court of Federal Claims. In that suit, the FJBC "alleg[ed] that, under the 1908 Act, they were entitled to operation of both the irrigation and power divisions and that defendant's failure to turn over those operations was a breach of statutory (four counts) and contractual (seven counts) obligations. Plaintiffs further alleged that [the United States'] failure to turn over the operation and maintenance of the irrigation and power divisions, and [the United States'] contract with the tribes to operate the power division, constituted a temporary taking for which they were entitled to just compensation under the Fifth Amendment to the Constitution." *Flathead*, 30 Fed. Cl. at 291. All but three of the claims were dismissed for either lack of jurisdiction or failure to state a claim. *Id.* at 296. The only claims that survived were contract claims based on alleged breaches of amendatory repayment contracts signed by the irrigation districts in accordance with the 1948 Act.

## B.    The Current Dispute

The current dispute stems from a breakdown in the efforts to transfer operation and management of the Project to the landowners in accordance with the

1908 Act. Plaintiff FJBC is a public corporation under Montana law that serves as the central control agency of the Flathead, Mission, and Jocko Irrigation Districts.[2] Plaintiff FID is a public corporation under Montana law with the authority and responsibility to represent landowners within the boundaries of the FID as to irrigation matters.[3] FID is one of three irrigation districts that comprise the FJBC.

Until 2010, Defendant BIA was responsible for the operation and management of the Project. In 2004, the final portion of the construction costs of the Project was repaid,[4] and thus, pursuant to the Act of 1908, operation and management of the Project was then to be transferred to the owners of the land irrigated by the Project. 35 Stat. 444, 449-450. Accordingly, in March of 2010, the FJBC and the Tribes entered into the Cooperative Management Entity Agreement. This Agreement created the Cooperative Management Entity ("CME"), which was comprised of an equal number of appointed representatives

---

[2] Given that two of the three irrigation districts have withdrawn from the FJBC, it is not clear whether the FJBC is currently constituted.

[3] Plaintiffs allege that the FJBC is a "local governmental entity," (Doc. 14 at 2), and that the FID is an "elected local government[]," *id.* at 3, but these allegation are plainly contrary to Montana law, which provides that "[e]very irrigation district . . . is a public corporation." Mont. Code Ann. § 85-7-109. This is true despite the fact that irrigation districts have annually elected commissioners and the authority to levy taxes or assessments on lands within an irrigation district.

[4] As noted above, the actual method of repayment of the construction and operating costs was modified numerous times by Congressional Acts.

of the Tribes and the FJBC and was formed to jointly manage and operate the Irrigation Division of the Project. Upon execution of the Cooperative Management Entity Agreement, the FJBC, the Tribes, and the Department of the Interior entered into the "Transfer Agreement," which permitted the CME to assume management and operational control of the Irrigation Division of the Project in accordance with the 1908 Act.[5]

The Transfer Agreement and CME Agreement represented the culmination of several years of negotiations between the BIA, the FJBC, and the Tribes to effectuate transfer in accordance with the 1908 Act. Significantly, the Transfer Agreement contained a provision for the "emergency reassumption of the operation and management of all or part of the Project" by the BIA if the Secretary of the Interior determined such emergency reassumption was necessary. (Doc. 28-2 at 14.)

Following the execution of the Transfer Agreement, the CME managed the Project from 2010 through early 2013. However, beginning in May of 2013, during the FJBC's regularly scheduled elections, certain FJBC board members who were supportive of the Transfer Agreement were voted off the Board. Soon

---

[5] As noted above, since 1986, the Power Division of the Project has been operated by the Tribes pursuant to a P.L. 638 Contract.

afterward, significant disagreements concerning the CME's operation and management of the Project arose among the three irrigation districts. In December of 2013, two of the three irrigation districts comprising the FJBC, the Mission and Jocko irrigation districts, voted to withdraw from the FJBC, and the FJBC was effectively dissolved.

The Commissioners of the two withdrawing districts then wrote to the BIA and formally requested that the BIA temporarily reassume Project operations in order to "safeguard the [P]roject and trust assets." (Doc. 28-4 at 3.) Consistent with this request, in a letter dated January 15, 2014, the BIA invoked the emergency reassumption provision of the Transfer Agreement, and informed the chairmen of the CME that it would resume operation and management of the Project "in a limited capacity" in order "[t]o protect its federal assets and the trust resources of the CSKT." (Doc. 28-5 at 2.) The BIA intended that its reassumption of operation of the management of the Project would be limited, temporary, and serve only as a stop-gap measure in order to maintain services to irrigators during the 2014 irrigation season while the parties negotiated a long term solution.

By letter of February 3, 2014, the BIA proposed reconstituting a modified version of the CME to serve as the legal entity with responsibility for operating and managing the Project. Under the proposal, the modified CME would be

comprised of nine members, rather than eight — the CSKT would appoint four members, the FID would appoint two members, the remaining two irrigation districts would appoint one member each, and the BIA would appoint one member.  The BIA member was to serve as the Chair of the CME, but would not vote on any issues unless there was a tie.  The BIA asked that the parties indicate their acceptance of the proposal by February 7, 2014.  By February 7, 2014, the Mission Irrigation District, Jocko Valley Irrigation District, and the Tribes voted to approve the proposal.

The FID did not respond to the proposal by February 7th.  Instead, on February 19, 2014, the FID sent to the BIA a "counterproposal."  Among other provisions, the counterproposal required that an entity called the New Management Entity ("NME") should serve as the legal entity for operation and management of the Project.  The NME would consist of thirteen members and, among other requirements, would be comprised of two representatives for the CSKT, two representatives for the Mission Irrigation District, one representative for the Jocko Valley Irrigation District, and eight representatives for Plaintiff FID.

These terms were not acceptable to the BIA, the Secretary of the Interior, or any of the other irrigation districts, and the BIA formally rejected the terms of the counterproposal in a letter to all CME Chairmen dated March 11, 2014.  In the

same letter, the BIA informed the Chairmen that, in accordance with the emergency reassumption provision of the Transfer Agreement and the authority reserved in 1908 Act, it would fully reassume the operation and management of the Project. The BIA stated that its decision to resume operation and management of the Project was based on the need to protect federal assets and the trust resources of the Tribes, and to ensure that the Project's real property was maintained and safety requirements were met. The BIA further stated that its management and operation of the Project would "continue indefinitely pending resolution of the issues that would allow the BIA to transfer Project O&M consistent with the requirements of the 1908 statute." (Doc. 28-8 at 5.)

Plaintiffs responded by initiating this lawsuit on April 2, 2014. Plaintiffs' Complaint alleged that the BIA's reassumption of control of the Project violated the 1908 Act. Plaintiffs also alleged that the CME lacked proportional representation as required under Montana law. The United States moved for a more definitive statement.

### C. Plaintiffs' Amended Complaint

Rather than respond to the motion for a more definite statement, Plaintiffs filed their Amended Complaint on July 28, 2014. The Amended Complaint asserts six counts, all of which seek either declaratory or injunctive relief. The Amended

Complaint also seeks attorneys' fees.

Count One asks the Court to order the formation of an entity to operate and manage the Project. Count One further requests that the Court declare that this entity's "permanent features" include essentially all of the features of the NME as proposed by the FID in its counterproposal. (Doc. 14 at 32.) Count One also asks the Court to declare that the 1908 Act requires turnover of the operation and management of the entire Project, including both the Irrigation and Power Divisions of the Project. In a related claim for injunctive relief, Count Four asks the Court to permanently enjoin "the federal takeover of operation of the Project." *Id.* at 34.

Count Two asks the Court to declare that "the United States has been and continues to transfer land that was or is owned in fee within the Project into trust status in violation of 25 U.S.C. § 463(a)." *Id.* at 33. In a related claim for injunctive relief, Count Five asks the Court to enjoin the United States from any further transfer of land within the Project from fee to trust status.

Count Three asks the Court to declare that "since the early 1990's" the Power Division of the Project has been operated in contravention of 62 Statute 269, Act of May 25, 1948 ("1948 Act"), "in a variety of ways that will be demonstrated through the course of this litigation." *Id.* at 33. In a related claim

for injunctive relief, Count Six requests an injunction prohibiting the continued operation of the Power Division "in contravention of the 1948 Act." *Id.* at 34. Count Seven seeks attorneys' fees under the Equal Access to Justice Act.

The United States moved to dismiss the Amended Complaint, and in the alternative for summary judgment on October 23, 2014. The motion was fully briefed on February 20, 2015. Due to failure to comply with Local Rule, the Court denied the motion to dismiss without prejudice on March 4, 2015.

On March 13, 2015, the United States renewed its motion to dismiss, and in the alternative, for summary judgment. The motion was completely briefed on April 10, 2015, when the United States filed its reply brief in support of the renewed motion to dismiss.

### D. Plaintiffs' Proposed Second Amended Complaint

On May 21, 2015, Plaintiffs filed a motion to amend their complaint, again. Plaintiffs attached as an exhibit their Proposed Second Amended Complaint ("Proposed Complaint")—a 40-page complaint with over 400 pages of attached exhibits. The Proposed Complaint adds new parties, including two new plaintiffs, the Mission Irrigation District and the Jocko Valley Irrigation District, and one

new defendant, the State of Montana.[6]

There are some stylistic changes and corrections of typographical errors, but substantively the Proposed Complaint alleges that the recent ratification of the Confederated Salish and Kootenai Tribes Water Compact ("the Water Compact"), by passage of Montana Senate Bill 262, is "an illegal attempt to preempt the FAA Turnover provision." (Doc. 66-1 at 36.) Plaintiffs seek a declaration that the Compact is invalid, null, and void because it is preempted by federal law. Plaintiffs also seek associated injunctive relief. The Proposed Complaint also alleges that certain funds held by the CME that were derived in part from Operation and Maintenance monies paid by irrigators "are scheduled to be transferred to another entity at the end of May 2015." *Id.* at 32-33. The Proposed Complaint alleges that this scheduled transfer "to another entity" is wrongful and seeks a declaration "ordering turnover of the CME funds to the FJBC" and injunctive relief. *Id.* at 37. Finally, the Proposed Complaint alleges that since the BIA took over management of the Project, it has mismanaged the Project, resulting in additional damages to Plaintiffs.

The United States opposes the motion for leave to file the Proposed

---

[6] In its brief in support of the motion to amend, Plaintiffs fail to address the fact that the Proposed Complaint seeks to add two new plaintiffs.

Complaint, arguing that the motion should be denied for a variety of reasons, including that the proposed amendments are futile because all of the new claims and allegations are subject to dismissal under Rule 12(b). Plaintiffs' motion to amend was completely briefed on July 27, 2015. All motions are now ripe for decision.

## DISCUSSION

For the reasons explained below, the Court determines that Plaintiffs' Amended Complaint must be dismissed pursuant to Rule 12(b). Additionally, the Court denies Plaintiffs' motion for leave to file their Proposed Complaint because it finds that the proposed amendments are futile and subject to dismissal under Rule 12(b). Because the reasons in large part for dismissal of the Amended Complaint are the same for finding that leave to file Plaintiffs' Proposed Complaint is futile, the Court first addresses the United States' motion to dismiss Plaintiffs' Amended Complaint and then addresses Plaintiffs' motion for leave to file the Proposed Complaint.

## I.      Motion to Dismiss Amended Complaint

### Legal Standard

Pursuant to Rule 12(b)(1), a Court may dismiss a complaint, or any claim, for lack of subject matter jurisdiction. When considering a Rule 12(b)(1) motion

that substantively challenges the existence of jurisdiction, the Court is not limited to the allegations in the complaint but may consider materials outside the pleadings. *Assoc. of Am. Med. Colleges v. United States*, 217 F.3d 770, 778 (9th Cir. 2000). No presumption of truthfulness applies to the allegations of a complaint in deciding a substantive challenge to jurisdiction. *Thornhill Pub. Co., Inc. v. General Tel. & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). Once challenged by Rule 12(b)(1) motion, the burden of establishing jurisdiction is on the plaintiff. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942).

Rule 12(b)(6) motions test the legal sufficiency of a pleading. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the court can draw a "reasonable inference" from the facts alleged that the defendant is liable for the misconduct alleged. *Id.*

## Analysis

### A.  Counts One and Four—Turnover

Count One asks the Court to declare, and create out of whole cloth, an entity to operate and manage the Project whose permanent features would be tailored to Plaintiffs' liking.  The entity proposed in Plaintiffs' Amended Complaint mirrors in all material respects the "NME" which was described in Plaintiffs' counterproposal of February 19, 2014.  Notably, the parties to this lawsuit do not dispute whether the management and operation of the Project must, in accordance with the 1908 Act, pass to the owners of the lands irrigated thereby.  The sticking point has been, and is, "under [what] form or organization and under [what] rules and regulations" the transfer of operation and management must occur.  35. Stat. at 450.  Plaintiffs contend that the form and rules proposed in their Amended Complaint constitute the appropriate form.  The United States rejects this proposed form because it contends that this proposed form and associated rules are not "acceptable to the Secretary of the Interior."  35. Stat. at 450.

The United States contends that Plaintiffs' claims associated with turnover must be dismissed for lack of jurisdiction, and even assuming jurisdiction, for lack of merit.  The Court agrees with the United States.

"It is elementary that the United States, as sovereign, is immune from suit

18

save as it consents to be sued." *United States v. Mitchell*, 445 U.S. 535, 538 (1980)( (citation omitted)). Thus, in challenging the BIA's reassumption of management and operation of the Project, and in seeking the transfer, by judicial declaration, of the operation and management of the Project to Plaintiffs' proposed entity, the Court must determine whether there is an applicable waiver of sovereign immunity.

In their Amended Complaint and brief in response to the motion to dismiss, Plaintiffs reference the Declaratory Judgment Act, 28 U.S.C. § 2201, and general federal question statute, 28 U.S.C. § 1331, as supplying the Court with jurisdiction over their claims. It is well-established, however, that neither the Declaratory Judgment Act nor the general federal question statute provide the necessary waiver of sovereign immunity for suits against the United States. *Morongo Band of Mission Indians v. Calif. State Bd. Of Equalization*, 858 F.2d 1376, 1382–83 (9th Cir.1988)(Declaratory Judgment Act); *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088, n.3 (9th Cir. 2007)(federal question).

Because Plaintiffs cite no other possible waiver of sovereign immunity, the Court presumes that Plaintiffs are attempting to bring a claim under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702 and 706, though this is not clear from a review of Plaintiffs' Amended Complaint. As it is not clear that

19

Plaintiffs intend to bring an APA claim, it is also not clear under what section of the APA Plaintiffs intend to bring suit. But, because § 706 appear to be possibly applicable, the Court will assume that Plaintiffs intend to seek judicial review of the BIA's action under § 706 of the APA.

Even liberally construing Plaintiffs' Amended Complaint in this fashion, it is clear that Count One fails for lack of jurisdiction because the 1908 Act, on which Plaintiffs rely, "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Accordingly, the challenged agency action is not subject to judicial review under the APA.

The 1908 Act clearly vests the Secretary with discretion to establish an entity to manage and operate the Project. Its terms require neither immediate turnover upon repayment nor turnover in any particular fashion. It requires turnover, but only turnover "under such form of organization and under such rules and regulations as may be acceptable to the Secretary of the Interior." 35 Stat. at 450. This requirement provides "no meaningful standard against which to judge" the Secretary's actions with respect to BIA's challenged actions. *Heckler*, 470 U.S. at 830. Given the broad discretion vested in the Secretary to determine the form and fashion of turnover, Count One of Plaintiff's Amended Complaint is not

subject to judicial review under the APA because such discretionary acts are outside of the scope of review provided under 5 U.S.C. § 701(a)(2). Accordingly, the Court lacks jurisdiction over this claim and it must be dismissed.

Furthermore, even if the BIA's decision to resume operation and management of the Project were subject to judicial review under the APA, Count One still fails. The 1908 Act makes clear that turnover may occur only in the form and under such rules as are acceptable to the Secretary. Plaintiffs specifically request that this Court, by judicial edict, form an entity of their design responsible for operating and managing the Project that would be, without question, understandably unacceptable to the Secretary. The BIA formally rejected an identical proposal in its March 11, 2014 letter, and the fact of this suit makes clear that its position has not changed. Even assuming jurisdiction under the APA, Plaintiffs cannot compel its requested agency action. Indeed, had the BIA acted as Plaintiffs request the Court to act, the BIA's action would have been *ultra vires* because, in contravention of the 1908 Act, the BIA would have transferred operation and management of the Project to an entity that was unacceptable to the Secretary. Plaintiffs' contention that proportional representation is required is wholly detached from the language of any law and appears to be merely a creation of their own desire.

Under no set of facts would Plaintiffs ever be entitled to the requested declaratory relief. The Court has no authority to order the formation of an operation and management entity that contravenes the will of the Secretary. Accordingly, even assuming jurisdiction, Count One must be dismissed for failure to state a plausible claim for relief.

For the same reasons, Count Four also fails to state a plausible claim for relief, and must be dismissed. In Count Four, Plaintiffs ask the Court to enjoin the BIA from operating and managing the Project. The BIA's authority to resume operation and management, however, was specifically reserved in the Transfer Agreement under the emergency reassumption provision, and implicitly reserved under the 1908 Act . The Transfer Agreement's emergency reassumption provision was acceptable to the Secretary. The Court cannot order that the BIA be forever enjoined from operating and managing the Project, because this would be in contravention of the will of the Secretary, and thus contrary to the 1908 Act.

Though Plaintiffs contend that the Transfer Agreement is void because the CME became defunct when the FJBC dissolved, this makes no difference. Through the 1908 Act, the Secretary reserved to itself the discretion to determine the form and organization of any entity that would operate and manage the Project. In agreeing to transfer operation and management of the Project to the CME under

the Transfer Agreement, the BIA memorialized this reserved authority through every provision of the Transfer Agreement, including the emergency reassumption provision. Until such time as an acceptable form and organization for operation and management of the Project by the landowners could be established, turnover is not required.

The 1908 Act reserved to the Secretary the authority to protect federal assets and fulfill trust responsibilities owed to the Confederated Tribes. The 1908 Act authorized the Secretary to "perform any and all acts to make such rules and regulations as may be necessary and proper for the purpose of carrying the provision of [the 1908 Act] into full force and effect." 35 Stat. at 448. Plaintiffs rely entirely on the 1908 Act in seeking to declare the Secretary's reassumption of operation and management illegal, but as set forth above, the 1908 Act vests the Secretary with significant discretion and reserves to the Secretary the authority to operate and manage the Project until an entity comprised of landowners can be established that is acceptable to the Secretary.

As with the requested declaratory relief, under no set of facts would Plaintiffs ever be entitled to the requested injunction because the BIA's authority to manage and operate the Project in the absence of any other acceptable entity to manage it was reserved in the 1908 Act. Accordingly, Count Four fails to state a

plausible claim to relief and must be dismissed.

### B. Counts Two and Five—Land into Trust

Count Two asks the Court to declare that "the United States has been and continues to transfer land that was or is owned in fee within the Project into trust status in violation of 25 U.S.C. § 463(a)." *Id.* at 33. The United States contends that Count Two must be dismissed for lack of jurisdiction, exceeding the statute of limitations, failure to exhaust administrative remedies, and failure to state a claim. The Court agrees that Count Two fails to identify any discrete agency action as would give the Court jurisdiction under the APA. Furthermore, assuming that Plaintiffs mean to challenge the United States' restoration of lands to tribal ownership in 1936 or 1937, the claim is well beyond the statute of limitations. Count Two is therefore dismissed.

Though the Amended Complaint is far from clear on this point, the Court must again assume that Plaintiffs are attempting to bring Count Two under the APA because the APA provides the only vehicle for a waiver of sovereign immunity. To proceed under the APA, Plaintiffs must identify and challenge a discrete agency action. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004). Count Two fails to do so. Count Two fails to identify any specific transfer of land on which Plaintiffs base their allegation that the United States has

violated 25 U.S.C. § 463(a).  Plaintiffs identify neither a date of any transfer of lands nor the size or precise location of the lands involved in the alleged transfer. Plaintiffs' presumptive APA claim cannot rest on such bare allegations.  For this reason alone, Count Two fails to state a plausible claim for relief and must be dismissed.

Assuming that Plaintiffs mean to challenge the specific restoration of lands to tribal ownership that the United States admits that it performed in 1936 or 1937, the claim fails because it far exceeds the statute of limitations.  The United States admits that in 1936 or 1937 it restored certain unallotted federal surplus lands to tribal ownership pursuant to 25 U.S.C. § 463(a).  If Plaintiffs intend, obliquely, to base their claim on these 1936 or 1937 transfers, the statute of limitations for such a claim has long-since passed.  28 U.S.C. § 2401(a).  Plaintiffs provide no explanation as to why any tolling theory would apply to such a dated claim.

Plaintiffs are also not entitled to discovery to attempt to "uncover" other allegedly illegal transfers.  Plaintiffs Amended Complaint fails to meet the pleading standard required under Rule 8 of the Federal Rules of Civil Procedure. *Iqbal*, 556 U.S. at 678 ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face").  It must therefore be dismissed.

Count Five asks the Court to enjoin the United States from any further transfers of land within the Project from fee to trust status. The United States contends this claim must be dismissed for lack of standing. The Court agrees.

Plaintiffs' request for prospective injunctive relief rests entirely on speculation. Plaintiffs fail to identify any potential future transfer of land under 25 U.S.C. § 463(a) that has even been proposed by the United States. Therefore, Plaintiffs fail to invoke the Court's jurisdiction, which is limited to "Cases" and "Controversies." U.S.C.A. Const. Art. III § 2. Plaintiffs are not entitled to injunctive relief from a hypothetical future injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs entirely fail to identify a concrete, particularized injury that is redressable through the requested injunctive relief. Instead, Plaintiffs merely assert a conjectural or hypothetical future injury whose redressability through the requested injunctive relief is speculative. Plaintiffs therefore lack standing for Count Five, and it is accordingly dismissed.

### C. Counts Three and Six— Power Division of the Project

Count Three asks the Court to declare that "since the early 1990's" the Power Division of the Project has been operated in contravention of the 1948 Act "in a variety of ways that will be demonstrated through the course of this litigation." *Id.* at 33. Count Six requests an injunction prohibiting the continued

operation of the Power Division "in contravention of the 1948 Act." *Id.* at 34.

Both Count Three and Count Six refer to violations of the 1948 Act, but in the factual recitation of the Amended Complaint, and in Plaintiffs' brief in response to the motion to dismiss, Plaintiffs appear to also assert violations of the Indian Self-Determination Act. For instance, in the Amended Complaint Plaintiffs allege the following: "The Power Division of the Project is now operated by the CSKT under a contract with the Defendant BIA in violation of P.L. 638." (Doc. 14 at 29.) But, in Plaintiffs' Brief in Response to the Motion to Dismiss, Plaintiffs contend that: "Count Three of the Amended Complaint alleges violation of the Indian Self-Determination and Education Assistance Act." (Doc. 58 at 24.) The United States contends that regardless of this confusion both claims must be dismissed for lack of jurisdiction. The Court agrees.

Whether Plaintiffs are alleging violations of the 1948 Act or the Indian Self-Determination Act, or both, Plaintiffs' claims related to tribal operation of the Power Division of the Project must be dismissed for lack of jurisdiction. Again, these claims must be construed as APA claims, because otherwise there is no identifiable waiver of sovereign immunity and the claims are subject to dismissal for lack of jurisdiction. However, Plaintiffs themselves are apparently unsure if Count Three is, or can be, brought under the APA. They seek to premise judicial

27

review on the Declaratory Judgment Act, which they cannot, and in a hedged but conclusory fashion assert that Count Three is "potentially" subject to review under the APA. (Doc. 58 at 31.) Plaintiffs make no attempt to demonstrate that Count Six is subject to review under the APA.

Once challenged, the burden is on the plaintiff to demonstrate that the Court has subject matter jurisdiction to hear a claim. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942). Plaintiffs' tentative and unsupported assertion that these claims *might* be subject to review under the APA are insufficient to sustain this burden. Accordingly, Counts Three and Six must be dismissed for lack of jurisdiction.

The Court also agrees with the United States that Plaintiffs have not pled sufficient factual matter to support standing.[7] In conclusory fashion, Plaintiffs allege that since the execution of the P.L. 638 contract, "the revenues of the Power Division have been systematically generated and, to some degree, misdirected in violation of the 1948 Act in a variety of ways." (Doc. 14 at 33.) No factual allegations in the Amended Complaint support this sweeping allegation. Critically, no facts suggest that any "misdirected" revenues were intended to

---

[7] A plaintiff must demonstrate standing to invoke the jurisdiction of the federal courts. *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 645 (9th Cir. 2011). Standing has three requirements: injury in fact, a causal connection between the injury and the conduct complained of, and a likelihood that the injury will be redressed by a favorable decision. *Defenders of Wildlife*, 504 U.S. at 560.

benefit Plaintiffs. Thus, Plaintiffs have failed to plead an injury in fact. Plaintiffs'

contention, supplied only in their response brief, that standing for this claim may

be premised on the allegation of a "lack of accounting for net revenues" only

underscores the insufficiency of the alleged injury. *See Defenders of Wildlife*, 504

U.S. at 575. Plaintiffs have not alleged a particularized injury. Rather, Plaintiffs

assert only a "generalized grievance" that the United States has violated the law.

*Id.* It is well-established that such claims are insufficient to invoke a federal

court's jurisdiction under Article III. *Id.*

Plaintiffs also fail to plead any facts showing that the above-described

generalized grievance is traceable to the United States. Perhaps it could be

inferred that Plaintiffs are obliquely attempting to premise traceability on the

United States' execution of the P.L. 638 contract with the Tribes to operate the

Power Division, but such a claim is clearly beyond the statute of limitations.

Claims against the United States are subject to a six year statute of limitation. 28

U.S.C. § 2401(a). The Tribes entered into the P.L. 638 contract to operate and

manage the Power Division of the Project in 1986. There is no question that

Plaintiffs were aware of this because in 1988 Plaintiffs filed suit against the

United States and the Tribes seeking to enjoin the enforcement of the contract.

*Joint Board of Control of the Flathead, Mission and Jocko Irrigation Districts*,

No. CV 86-216-M-CCL (Doc. 56-2). The discovery doctrine is thus inapplicable, *Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1364 (9th Cir. 1990). To the extent that traceability is premised on the execution of the P.L. 638 contract, the statute of limitations has long since passed.[8] Because Plaintiffs have failed to establish either a particularized injury in fact or traceability, redressability is entirely speculative.

For all of the reasons described, Counts Three and Six must be dismissed.[9]

## II.     Plaintiffs' Motion for Leave to Amend the Complaint

After the United States filed a motion for a more definite statement with respect to Plaintiffs original Complaint, Plaintiffs filed their Amended Complaint. Ten months later, after the second round of briefing on the United States' motion to dismiss the Amended Complaint had been completed, Plaintiffs filed the instant motion for leave to file a the Proposed Second Amended Complaint. As noted

---

[8]   Such a claim is also likely barred by claim preclusion doctrines.

[9] The United States also assert that Counts Three and Six are subject to dismissal for failure to exhaust administrative remedies under 25 C.F.R. § 2.6, citing *White Mtn. Apache Tribe v. Hodel*, 840 F.2d 675, 677 (9th Cir. 1988). Plaintiffs make no attempt to address this argument. Additionally, the United States asserts that Counts Three and Six are subject to dismissal to the extent that they are based on violations of the Indian Self Determination Act because Plaintiffs' lack statutory standing for such claims. *citing Joint Board of Control of the Flathead, Mission and Jocko Irrigation Districts*, No. CV 86-216-M-CCL (Doc. 56-2). The Court need not address these arguments because the Court finds that Plaintiffs lack Article III standing to assert these claims.

above, the Proposed Complaint adds two new plaintiffs and a new defendant. It also adds two new claims and alleges new damages stemming from its claim alleging wrongful turnover (Counts One and Four, dismissed above). Each substantive amendment will be addressed in turn.

## Legal Standard

Leave to amend a complaint should be freely granted "when justice so requires." Fed.R.Civ.P. 15(a). Courts must consider four factors when assessing a motion to amend a complaint: (1) bad faith on the part of the party seeking amendment; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of the proposed amendment. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir. 1999). "Leave to amend need not be given if a complaint, as amended, is subject to dismissal." *Moor v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002).

Under Rule 15(d), a court "may permit supplementation" for "any transaction, occurrence, or event that happened after the date of the pleading." Fed.R.Civ.P. 15(d); *see also Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 874 (9th Cir. 2010). Rule 15(d) is a "tool of judicial economy and convenience" designed to "avoid the cost, delay and waste of separate actions." *Keith v. Volpe*, 858 F.2d

467, 473 (9th Cir. 1988). In order to properly invoke Rule 15(d), "some relationship must exist between the newly alleged matters and the subject of the original action." *Id.* Rule 15(d) "cannot be used to introduce a 'separate, distinct and new cause of action.'" *Planned Parenthood of S.Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997)(per curiam)(quoting *Berrsebrugge v. Luce Mfg. Co.*, 30 F.Supp. 1010, 102 (W.D. Mo. 1939)). The factors for assessing a motion to supplement under Rule 15(d) overlap with the factors, detailed above, for assessing a motion to amend under Rule 15(a). *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996).

## Analysis

### A.    Additional Damages

Plaintiffs' Proposed Amended Complaint contains new factual allegations asserting a variety of damages stemming from the BIA's operation and management of the Project. No new count is added with respect to these damages. These new allegations are rooted in Plaintiffs' claim that the BIA's reasssumption of operation and management is wrongful and that turnover is mandated. For all of the reasons explained above, Counts One and Four, related to turnover are subject to dismissal. Thus, the portions of the Proposed Complaint detailing additional damages related to turnover are also subject to dismissal. Granting

32

leave to add these allegations is denied as adding them would be futile.

**B.      Claims against the State of Montana**

Plaintiffs' Proposed Complaint adds the State of Montana as a defendant.
However, none of the Counts are directed specifically against the State of
Montana.   Rather all counts are asserted against all Defendants without further
specificity.  It is obvious that the State of Montana is not responsible for many of
the allegations.  For instance, no facts are alleged that would implicate the State of
Montana in the BIA's reassumption of operation and management of the Project,
or in transferring land from fee into trust, or in distribution of revenues from the
Power Division of the Project.  To the extent that factual allegations in the
Proposed Complaint implicate the State of Montana, Plaintiffs' claims appear to
be premised on the ratification of the Water Compact by passage of Senate Bill
262.[10]

The United States contends that granting leave to amend to add the State of
Montana would be futile because (1) the State of Montana is immune from the suit

_____

[10]   It does not appear that Plaintiffs' preemption claim is directed against the United
States.  Obviously, the United States is not responsible for passage of Montana Senate Bill 262.
To the extent that Plaintiffs' preemption claim is supposed to be directed against the United
States, the claim fails.  No facts alleged plausibly suggest that the United States is liable for any
alleged harm associated with Plaintiffs' preemption claim, and Plaintiffs have certainly not
alleged any final federal agency action with respect to the preemption claim.

by virtue of the Eleventh Amendment; (2) as a political subdivision of the State of Montana, Plaintiffs lack standing; (3) Plaintiffs' preemption claim is subject to dismissal because there is no conflict between the Water Compact and federal law; and (4) Plaintiffs' claims are not ripe. The United States further submits that the proposed amendment should not be granted as it is contrary to judicial efficiency because the primary subject of this litigation, i.e., whether the BIA's reassumption of operation and management of the Project is proper, is wholly distinct from the proposed preemption claim against the State of Montana for passage of the Water Compact.

The Court agrees that Plaintiffs' claim against the State of Montana is both contrary to judicial efficiency and futile. Plaintiffs claim against the State of Montana is based on its passage of Senate Bill 262. This action has been primarily focused on the BIA's reassumption of operation and management of the Project pursuant to the Act of 1908 and the Transfer Agreement. With the addition of this new claim against the State of Montana, Plaintiffs are attempting bring in all new allegations that are wholly distinct from the subject of the original action. Amendment is therefore improper under Rule 15(d). *Keith*, 858 F.2d 467, 474; *Planned Parenthood of S.Ariz.*, 130 F.3d 400, 402.

Furthermore, Plaintiffs concede, as they must, that the Water Compact still

must be ratified by Congress and the Tribes before the settlement will go into effect. Water Compact, Art. VII (Doc. 70-1 at 48-49). Since the Water Compact, absent ratification by the Tribes and Congress has no legal effect, Plaintiffs' claims are not yet ripe. Worse, if Congress does ratify the Water Compact, Plaintiffs' preemption claim will fail because the Water Compact will then become federal law. *Cuyler v. Adams*, 449 U.S. 433, 440 (1981). Accordingly, amendment or supplementation to add this claim would be futile.

For all of these reasons, the Court denies Plaintiffs' motion for leave to amend the Amended Complaint by adding the State of Montana.

## C.    CME Funds Transfer

The Proposed Complaint also alleges that certain funds held by the CME that were derived in part from Operation and Maintenance monies paid by irrigators "are scheduled to be transferred to another entity at the end of May 2015." *Id.* at 32-33. The Proposed Complaint alleges that this scheduled transfer "to another entity" is wrongful, and seeks declaratory and injunctive relief "ordering turnover of the CME funds to the FJBC." *Id.* at 37. The Proposed Complaint alleges that these unspecified "CME funds" are held in a bank account that "the CME continues to maintain." *Id.* at 32. The CME, which is allegedly "defunct," *id.*, is not a party to this lawsuit.

These allegations do not plausibly support a claim for relief against any of the Defendants, including the State of Montana. Plaintiffs do not allege any facts suggesting that the United States or the State of Montana has control over these unspecified CME funds. Nor do Plaintiffs allege any facts suggesting that the United States or the State of Montana has "scheduled" the alleged transfer. *Id.* In sum, it is not even clear which Defendant these claims are supposed to be directed against. If the claims are supposed to be directed against the United States, there is nothing to suggest that they are viable under the APA. *See, e.g. Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61-62 (2004)("the 'agency action' complained of must be '*final* agency action.'"). If the claims are against the State of Montana, there is nothing to suggest that it is responsible for scheduling the transfer or for controlling the CME funds.

Accordingly, leave to amend to add claims associated with the alleged wrongful scheduled transfer of funds held by CME is denied, as amendment would be futile.

IT IS ORDERED that:

(1)     Defendants' motion to dismiss (Doc. 55) is GRANTED.

(2)     Plaintiffs' motion for leave to amend (Doc. 66) is DENIED.

(3)     All other pending motions are DENIED AS MOOT.

The Clerk of Court is ordered to enter judgment in favor of Defendants and against Plaintiffs.  This case is CLOSED.

DATED this 19th day of August, 2015.

Dana L. Christensen, Chief District Judge
United States District Court